# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

ANDREA HERMAN, : 

      Plaintiff, :    Case No. 3:03CV384

 vs. :    Magistrate Judge Sharon L. Ovington
                   (by consent of the parties)

MONTGOMERY COUNTY : 
COMBINED HEALTH DISTRICT, 
et al., :

      Defendants. :

---

## ORDER OVERRULING  DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT (DOC. #10)

---

## I.    INTRODUCTION

Plaintiff Andrea Herman brings this employment-discrimination case against her employer Montgomery County, Ohio Combined Health District ("the Health District") and former Health Commissioner William H. Bines.  Herman claims that Defendants discriminated against her on the basis of sex in violation of (1) Ohio Rev. Code §§4112.02 and 4112.99; (2) the Equal Protection Clause of the United States Constitution's Fourteenth Amendment; (3) the Equal Pay Act, 29 U.S.C. §206(d); and (4) the State of Ohio's public policy.

The case is before the Court upon Defendants' Motion for Summary Judgment (Doc. #10), Herman's Memorandum in Opposition (Doc. #18), Defendants' Reply (Doc. #19), and the record as a whole.

II.     FACTUAL BACKGROUND

A.     **The Health District**

The Health District underwent organizational changes at various times during the mid-to-late 1990s and early 2000s.  By June 2002, the Board of Health directly supervised the Health Commissioner and the Medical Director.  (Doc. #13, Bines depos., Exh. 2 at 1).  The Health Commissioner supervised five Division Directors.  Each Division Director supervised one of the following Divisions: Administration, Special Services, Community Health, Environmental Health, and Personal Health.  *Id*.

The Division Director of Administrative Services supervised three Bureaus – Bureau of Management and Budget, Bureau of Administrative Services, and Bureau of Accounting Services.  *Id*. at 2.

B.     **Assistant to Division Directors**

The Health District hired Herman in August 1994 as the Assistant to the Division Director (not Assistant Director) of Special Services.  (Doc. #12, Herman depos. at 49).  In June 1996 Herman moved to the position of Assistant to the Director of Administrative Services with no change in her pay grade.  *Id*. at 49-50.  This constituted a lateral move.  *Id*. at 51.

Herman's work in these positions involved budgetary tasks such as developing budgets for federal and state agency grants; and developing personnel projections (salary/fringe benefits) for the Health District's 1997, 1998, and 1999 General Fund Budget.  *Id*., Exh. A at 1.  She also assisted with the development of the Health District's strategic planning, she monitored federal funding sources that would support public health issues, and she coordinated the Human

2

Services Levy Program and Financial Accountability process. *Id.*

When the Health District hired Herman, she was the only Assistant to the Director. Her pay grade was 48. The Health District eventually hired two more Assistants to the Director, both women, and both hired at pay grade 48. *Id.* at 13.

### C.      __Herman's Promotion and Pilkenton's Hire__

In 1999 William H. Bines became the Health Commissioner. (Doc. #13, Bines depos. at 6-7).

Commissioner Bines testified during his deposition that in approximately 1999 the Montgomery County Administrator informed him that the Health District lacked credibility as far as its budget was concerned. (Doc. #13, Bines depos. at 29-30). Bines explained, "I needed to take some action to achieve credibility again, to repair our budgeting process so that we, indeed, had accountability." *Id.* Shortly after that, the individual working as the Health District's Budget Analyst resigned, and Bines created the position of Supervisor, Bureau of Management and Budget. *Id.* at 30.

Herman was promoted to the position of Supervisor, Bureau of Management and Budget, and a new Budget Analyst was hired. *Id.* The new Budget Analyst, however, resigned about 18 months later. *Id.* at 31-33. As a result, Commissioner Bines met with Kenneth Dahms, the Health District's Director, Division of Administrative Services. Dahms held supervisory authority over the Bureau of Management and Budget, and was therefore Herman's immediate supervisor.

Both Commissioner Bines and Dahms decided that they needed to elevate the complexity of the Budget Analyst position by making it a Budget Manager position. *Id.* at 33. They also

3

decided, not surprisingly, that the Health District needed a Budget Manager with significant experience in budgeting.  *Id*. at 33.

The task of finding a qualified Budget Manager fell to Herman in her role as Supervisor, Bureau of Management and Budget.  Herman formed a search committee.  The Health District posted the job opening both internally and publicly.

Steven Pilkenton, Lori Hertlein, and others applied for the position.  At this time, the Health District employed Hertlein as Supervisor, Bureau of Accounting.  (Doc. #12, Herman depos. at 18-19).  Pilkenton was not employed by the Health District at the time of his application.  *Id*. at 61-62.  He had worked for General Motors Corporation for thirty years until he retired in 2002.  He last worked for GM as a Finance Manager from 1995 until 2002.  (Doc. #15, Pilkenton depos., Exh. 2).  It is undisputed that Pilkenton had extensive experience in budgeting during his thirty-years with GM.  It is also undisputed that Pilkenton did not have any work or budgeting experience in the public sector, with the Health District, or with any public health agency.

The search committee interviewed Pilkenton, Hertlein, and other applicants, and unanimously recommended Hertlein for the position.  (Doc. #12, Herman depos. at 62-63).  The committee did not recommend Pilkenton because, according to Herman, they felt that "he wasn't a good fit and that he would not be satisfied with the budget management position over time, that he would not be wanting to stay in that position."  *Id*. at 64.

Commissioner Bines rejected the search committee's recommendation and hired Pilkenton as the Budget Manager in the Bureau of Management and Budget.  Herman explains:

> Mr. Bines thought he was a good fit.  He said he [Pilkenton] was a runner
> and a golfer and said he was a good fit personality wise for the agency.  We have

4

a lot of runners and golfers at the agency.  And that's – it was not really discussed more than that....

*Id*. at 65.

During her deposition, Herman testified that when she was told about the decision to hire Pilkenton, she was also told that she was "going to be moved to bureau supervisor of administrative services."  *Id*. at 66.

### D.     <u>Pilkenton's Promotion and Pay Disparity</u>

On December 17, 2002, Dahms recommended to Commissioner Bines that Pilkenton be promoted to the position of Supervisor, Bureau of Management and Budget, and that Pilkenton receive a salary increase.  (Doc. #13, Bines depos., Exh. 17 at 4).  Bines approved the recommendation, and in January 2003 Pilkenton became Supervisor, Bureau of Management and Budget.  *Id*., Exh. 17 at 1.  At the time of his promotion and pay raise, the Health District had employed Pilkenton for approximately six months.  (Doc. #15, Pilkenton depos. at 46).

Pilkenton had not applied for this promotion, had never asked to be considered for this position, and he did not know that he was being considered for this Bureau-level Supervisor position.  *Id*.

Pilkenton received a pay raise to grade 59, step 33 equaling an annual salary of $77,584. (Doc. #14, Dahms depos., Exh. 1 at 3).

Herman testified during her deposition that when she held the position of Supervisor, Bureau of Management and Budget, her salary was less than Pilkenton's salary.  (Doc. #12, Herman depos. at 79-80).  Yet, it is unclear from the record exactly what salary Herman earned when she held this position.  The pay-raise recommendation written by Dahms indicates that

without a salary increase, Herman's pay on January 1, 2003 would be at pay grade 59, step 10 equaling a salary of $61,713.  (Doc. #14, Dahms depos., Exh. 1 at 1-2).  Dahms also indicated that with the recommended pay raise, which Herman in fact received, she would be at pay grade 59, step 23 equaling an annual salary of $70,262.  *Id.*

Herman pointed out during her deposition that this pay disparity existed despite the fact that Pilkenton had only supervised one program and one employee.  Herman had supervised six programs and over twenty employees.  (Doc. #12, Herman depos. at 69).

Dahms based his recommendations on his high opinion of Pilkenton's work.  Dahms described Pilkenton's job performance as follows:

> Steve has performed extraordinarily well in the capacity of Budget Manager.  He has rapidly mastered the complex nature of the Health District's finances and has made improvements to the existing system as he went along.  His vast experience in the private sector has transferred well to the public sector.  Steve interacts extremely well with Health District employees at all levels and has steadily built a network of contacts outside the agency.  The Health District is in great need of Steve's expertise as it enters a period of austerity and tight budgetary controls.  Steve can best provide this expertise from the position of Supervisor of Management and Budget.

(Doc. #13, Bines depos., Exh. 17 at 4).

Dahms also recommended that Herman receive a 13% merit-based pay increase.  Dahms based this recommendation on his high opinion of Herman's work.  Dahms wrote:

> Andrea has been my most trusted and dependable supervisor during the past several years.  She consistently produces work of high quality, often under severe time pressure.  Andrea is extremely versatile and has, at one time or another, had supervisory responsibility for almost every function within the Division of Administration....  At various times during the past few years we have asked Andrea to step in and run a department or function on an emergency basis....  She has done so successfully and with great enthusiasm.  She works long hours and never complains.  She is often asked by the Health Commissioner to perform special tasks.  She is a valued member of the Health District's internal levy review committee.  We will depend heavily upon Andrea's talents and

6

expertise in these areas during the coming years.

*Id*., Exh. 17 at 3.  Commissioner Bines approved Herman's pay raise.  *Id*.


**E.**     **Assistant Director/Director of Administration**

In early 2003 Dahms submitted his notice of resignation as Director of Administration.

(Doc. #14, Dahms depos. at 20-21).  It is undisputed that Bines and the Health Commission were

co-appointing authorities, *i.e.*, the final decisionmakers, concerning who the Health District

would hire to replace Dahms.  *See* Doc. #13, Bines depos. at 28, 40.

Bines posted a job opening for the position of Assistant Director/Director of

Administration, which described the position as follows:

> Position available in the Division of Administration, on an interim basis,
> responsible for working with the current Director of Administration, to learn the
> Director position.  Assuming satisfactory completion of this role, the individual
> will assume the duties of Director of Administration in early 2004....
> This position requires extensive knowledge of management, financial operations,
> public and human relations, government structure & process and general
> knowledge of human resources and information systems.
>
> Some of the job duties will include:
> • Plan, organize, direct, supervise, administer and evaluate the program
>   contents/activities of the Health District's division of administration;
>
> • Review budget & expenditure reports, prepare annual reports, plan and
>   administer agency fiscal programs (including budget preparation);
>
> • Formulate and recommend objectives, policies, plans/programs for the
>   development and management of the division; ensure compliance with
>   local, state and federal laws;
>
> • Direct the implementation of approved objectives, policies/programs, and
>   provide administrative leadership to members of the division management
>   team;
>
> NECESSARY QUALIFICATIONS
> This position requires seven years of progressively responsible administrative &

7

> financial experience in public or private sector business administration or
> municipal government and a Master's degree in Public Administration, Public
> Health, Business Administration or related field....

(Doc. #13, Bines depos., Exh. 10).

The Health District received over 130 applications for this position including Herman and Pinkleton.  (Doc. #13, Bines depos. at 67).

Commissioner Bines narrowed the list of candidates to sixteen including Herman, Pilkenton, and others.  He then interviewed each of the sixteen candidates and further narrowed the list to six finalists including Herman and Pilkenton.  *Id*. at 67-68.  Bines believed that each of the six finalists were qualified.  In Bines' words, "they all could have learned or done the job." *Id*. at 69.

Bines asked the Health District's five Division Directors to come together and interview each finalist.  *Id*. at 72.  Bines did not attend the Division Directors' interviews of the finalists. *Id*. at 74.  Only three of the five Division Directors interviewed each of the finalists.  Yet each Division Director participated in the selection and ranking process.  Bines explains that those who did not interview the finalists based their rankings on the candidates' resumes and their knowledge of the candidates.  *Id*. at 72.  Bines also understood that not all of the finalists were known to the Division Directors.  He acknowledges, "They were at a disadvantage to know some of the candidates, but I still required them to participate in the ranking and selection process." *Id*. at 72-73.

As to selection and ranking criteria, Bines instructed the Division Directors as follows:

> I told them that this position was basically the director of administration;
> that it was very important to get someone who could lead the Health District and
> its various programs.  I told them that ... my preference going in was Mr.
> Pilkenton, but that I wanted the other five division directors to give me their

8

opinions on who they thought would be the most appropriate leader for the Health District.

*Id*. at 73.  Bines also told the Division Directors that "the main agency objective was to regain credibility of the budgeting process with the Human Services Levy campaign."  *Id*. at 78.

A document summarizing the Division Directors' rankings reveals that three ranked Pilkenton as their first choice, three ranked Pilkenton as their second choice, one ranked Herman as his or her first choice, and two ranked Herman as their third choice.  *Id*. at Exh. 11.

Not surprisingly, given his previously expressed preference, Bines selected Pilkenton for the position of Assistant Director of Administration.

Bines informed Herman that although she was qualified for the position, she did not get the promotion.  According to Herman, Bines explained that Pilkenton had a good relationship with Tim Nolan, who was a County Budget Manager.  (Doc. #12, Herman depos. at 95.) Herman explains that she too had a good relationship with Nolan.  She had attended graduate school with him and had known him for twelve years.  *Id*.

Herman believes that Pilkenton was appointed Assistant Director of Administration because he is a male.  She explains:

> Well, because of all the history.  We've never had a female director historically.  We've never had a female director.  If I was qualified, then why not branch out and have a female director?  There's never been a female health commissioner, even though the State of Ohio has multiple females as division directors and health commissioners.  There are female health commissioners. There hasn't been one for Montgomery County.  If I didn't meet the qualifications, then I would understand why.  But when I meet the qualifications and am told by the health commissioner that I was qualified, then why not do it then.

*Id*. at 99-100.

Herman believes that Pilkenton was not qualified for the position as it was described in

9

the job-opening announcement.  *Id*. at 100 and Exh. E.  The job-opening announcement stated in part, "This position requires extensive knowledge of management, financial operations, public and human relations, government structure & process and general knowledge of human resources and information systems."  *Id*. at Exh. E.  Herman emphasizes that Pilkenton did not have extensive knowledge of public and human relations, information systems, and government structure because he had only been at a public health department for one year.  (Doc. #12, Herman depos. at 100-01).

Herman presently remains employed by the Health District as Bureau Supervisor of Administrative Services.

## III.    SUMMARY JUDGMENT STANDARDS

The central issue presented by a motion for summary judgment is a threshold issue – whether the case presents a proper jury question.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).  Summary judgment is warranted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson*, 477 U.S. at 247.

The burden falls on the party moving for summary judgment to show that the non-moving party has failed to establish an essential element of his case upon which he would bear the ultimate burden at trial.  *Betkerur v. Aultman Hospital Ass'n.*, 78 F.3d 1079, 1087 (6th Cir. 1996); *see Guarino v. Brookfield Tp. Trustees,* 980 F.2d 399, 403 (6th Cir. 1992).  If the movant makes this showing, the non-moving party may not rely on the bare allegations of the Complaint but must present affirmative evidence in support of his or her claims.  *Betkerur*, 78 F.3d at 1087;

10

see *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994). Indeed, the Court is not required "to search the entire record to establish that it is bereft of a genuine issue of material fact." *Betkerur*, 78 F.3d at 1087; *see InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Rather, the burden falls on the non-moving party to designate specific facts or evidence in dispute. *Anderson*, 477 U.S. at 250; *see Metiva*, 31 F.3d at 379; *see also Guarino*, 980 F.2d at 404-05. Yet, this burden is eased somewhat by the Court's duty to "believe the evidence presented by the nonmovant, and draw all justifiable inferences in his or [her] favor." *Cotter v. Ajilon Serv., Inc.*, 287 F.3d 593, 597 (6th Cir. 2002)(citing *Plant v. Morton Int'l., Inc.*, 212 F.3d 929, 933-34 (6th Cir. 2000)). The Court, moreover, will not weigh the evidence or evaluate witness credibility when determining whether summary judgment is warranted. *Metiva*, 31 F.3d at 379.

Ultimately, the Court must determine at the summary-judgment stage whether the evidence presents a sufficient factual disagreement to require submission of the challenged claim or claims to a jury or whether the evidence is so one-sided that the moving party must prevail as a matter of law. *Anderson*, 477 U.S. at 251-52; *see Little Caesar Enterprises, Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000).

## IV.   DISCUSSION

### A.   Equal Pay Act

#### 1.
#### The Parties' Contentions

Herman claims that Defendants violated her rights under the Equal Pay Act by paying Pilkenton a higher salary when he was appointed, in January 2003, to the position of Supervisor, Bureau of Management and Budget, the position she had previously held.

Defendants contend that they are entitled to summary judgment on Herman's claim under

the Equal Pay Act, because Pilkenton was more qualified and had more experience in management, budgeting, and supervising than Herman. Consequently, according to Defendants, non-discriminatory reasons support the pay differential.

## 2.
### The Equal Pay Act and
### the Parties' Respective Burdens

"The [Equal Pay Act] prohibits employers from paying an employee at a rate less than that paid to employees of the opposite sex for equal work."[1] *Buntin v. Breathitt County Board of Education*, 134 F.3d 796, 799 (6th Cir. 1998).

Proof of an Equal Pay Act violation begins with evidence establishing a prima facie case. *Buntin*, 134 F.3d at 799. To establish a prima facie case, the plaintiff must show that the employer paid "different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Buntin*, 134 F.3d at 799 (quoting in part *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974)). "The plaintiff may meet her prima facie burden by demonstrating a wage differential between herself and her predecessor." *Buntin*, 134 F.3d at 799.

Herman has produced sufficient evidence to demonstrate a prima facie violation of the Equal Pay Act. It is undisputed that Pilkenton's January 2003 promotion to the position of Supervisor, Bureau of Management and Budget included a pay raise to grade 59, step 33 equaling an annual salary of $77,584. (Doc. #12, Herman depos at 82; Doc. #14, Dahms depos.,

---

[1] The Equal Pay Act provides that no covered employer shall discriminate "between employees on the basis of sex ... for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions...." 29 U.S.C. §206(d)(1).

Exh. 1 at 3). In contrast, the Health District paid Herman substantially less when she held the same position. Dahms' written recommendation reveals that Herman's pay was somewhere within the range of pay grade 59, step 10 to step 23 equaling between $61,713 and $70,262. (Doc. #14, Dahms depos., Exh. 1 at 1-2). This pay disparity between Herman and Pilkenton for work in the identical position suffices to establish a prima facie case under the Equal Pay Act.

Because Herman has shown a prima facie case under the Equal Pay Act, the burden of persuasion shifts to Defendants to show "that the wage differential is justified under one of the four affirmative defenses set forth in the Equal Pay Act: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex." *Kovacevich v. Kent State University*, 224 F.3d 806, 826-27 (6th Cir. 2000). "The burden for proving that a factor other than sex is the basis for a wage differential is a heavy one." *Kovacevich*, 224 F.3d at 826-27.

Defendants contend, "in order to survive a dispositive motion, a plaintiff bears the burden to produce evidence that defendant employer's rationale for wage differential is merely a pretext. *Buntin v. Breathitt County Board of Education*, 134 F.3d 796, footnote 7." (Doc. #19 at 9). Care must be taken here, however, not to shift the burden of persuasion to Herman on Defendants' affirmative defenses, because she has established a prima facie case.

"In an [Equal Pay Act] case, the defendant *always* bears the burden of proving that its proffered reason is the true basis for the pay differential. The [Equal Pay Act] plaintiff bears the burden of *producing* evidence of pretext solely where a reasonable jury viewing the defendant's evidence could only find for the defendant; the plaintiff, however, never bears the burden of *persuasion* regarding affirmative defenses." *Buntin*, 134 F.3d at 800, n.7 (emphasis in original).

13

Footnote 7 in *Buntin* leaves no doubt that Herman does not bear the burden of proving that Defendants' explanation for the pay disparity was a pretext, or a cover-up, of an intention to pay Herman less based on her gender. *Buntin*, 134 F.3d at 800 at n.7. *Buntin* provides an instructive example of the proper analytical approach. During the trial in *Buntin*, the District Court directed a verdict in favor of the defendant Board of Education.[2] The Court of Appeals for the Sixth Circuit stated, "the district court's granting of the Board's motion for judgment as a matter of law was proper 'only if the record shows that they established the defense so clearly that no rational jury could have found to the contrary.'" 134 F.3d at 800 (citation omitted). The Court of Appeals then reversed the District Court's ruling in favor of the Board due to the existence in the trial record of genuine issues of material fact. *Buntin*, 134 F.3d at 800.

Because Herman has met her burden of establishing a prima facie case under the Equal Pay Act, summary judgment in Defendants' favor is warranted only if the record shows that Defendants have established an affirmative defense so clearly that no rational jury could find in Herman's favor on her claim under the Equal Pay Act. *See Buntin*, 134 F.3d at 799-800 and n.7; *see also Kovacevich*, 224 F.3d at 826-27. The analysis therefore turns next to the evidence of record.

### 3.
### Genuine Dispute of Material Fact Exist

Defendants point to the following to support its assertion that the pay disparity at issue was not based on gender:

> [The Health District] paid Pilkenton's wages at grade 59, step 33 because

---

[2]  The standards applicable to a motion for judgment as a matter of law at trial under Fed. R. Civ. P. 50 mirror the standards applicable to a motion for summary judgment. *Anderson*, 477 U.S. at 250-51.

> he was more qualified and had more experience in management, budgeting, and
> supervising than Herman....  Pilkenton had over 30 years experience with
> financing and management at his prior position with Delphi, before he even began
> at [the Health District].
>
> Herman had only nine years experience in management, budgeting, and
> supervising, all acquired at [the Health District].  Even her formal education could
> not match Pilkenton's level of experience.  Herman only had general accounting
> courses in college, over 15 years prior.  She studied more about financing for her
> master's in public administration as opposed to accounting.
>
> In his position of Bureau Supervisor Management and Budgets, Pilkenton
> was responsible for the entire budget of [the Health District]....  [T]he budget was
> the number one concern for both Bines and Dahms.  As such, Pilkenton was paid
> according to the significant role he played in improving the budgeting of [the
> Health District] thus far and in order to keep him employed at [the Health
> District].

(Doc. #10 at 16)(citations omitted).

There is no genuine dispute in the record concerning the Health District's need in early

2000 for a Budget Manager who could help the Health District regain its budgetary credibility.

There is likewise no doubt that Defendants hired Pilkenton as the Budget Manager because he

had extensive budgeting experience.  These undisputed facts, however, say little about the

specific skills or qualifications needed for the position at issue – Supervisor, Bureau of

Management and Budget.

A rational juror viewing the positions from the job titles alone could recognize that the

position of Budget Manager involved application of budgeting skills, while the Supervisor

position also held supervisory or management responsibilities.  This difference is confirmed by

the job descriptions of each position.  The Budget Manager position is described in general as

follows:

> Advanced level position in budgeting requiring a thorough knowledge of
> budgeting principles.  Under direction of bureau supervisor, employee is

15

responsible for preparing, updating and monitoring various Health District consolidated budgets.

(Doc. #13, Bines' depos., Exh. 15 at 1).

The managerial/supervisory nature of the Supervisor, Bureau of Management and Budget position is seen in the following description:

> Advanced level position in management, requiring a thorough knowledge of management, business administration and government structure and process. Under administrative direction, employee directs & supervises multiple program functions, while ensuring achievement of program goals and objectives and satisfactory employee performance.

*Id.*, Exh. 16 at 1.  The managerial/supervisory nature of this position is further seen in the required job duties.  For example, 40% to 60% of the time, the Supervisor, Bureau of Management and Budget "directs, coordinates and supervises activities related to bureau's programs...."  *Id.*  While this requires budgeting knowledge, it also requires knowledge of much more including, but not limited to, "management..,. supervision..., office management..., office practices and procedures..., government structure and process..., [and] business or public administration...."  *Id.*

It is undisputed that Pilkenton did not have any experience in the public sector or in governmental budgeting prior to his employment as the Health District's Budget Manager.  It is further undisputed that Herman had numerous years of experience with the Health District at the time she worked as the Supervisor, Bureau of Management and Budget.   A rational jury could view this relevant experience along with Herman's experience with governmental structure and processes as showing her to be better qualified than Pilkenton for the position of Supervisor, Bureau of Management and Budget.

In addition, although the record contains much general information, such as job titles,

16

about Pilkenton's work with GM, the record provides few specifics concerning the work he performed with GM and how this work made him more qualified than Herman for the position of Supervisor, Bureau of Management and Budget.  In light of Herman's work for the Health District, a rational jury could view the present record as supporting the conclusion that she held more relevant knowledge and skills than Pilkenton for the position of Supervisor, Bureau of Management and Budget.

Because genuine issues of fact exist regarding whether either Pilkenton or Herman held superior qualifications, knowledge, and skills required for the position Supervisor, Bureau of Management and Budget, Defendants have not met their heavy burden at the summary-judgment stage of showing that a rational jury could not find in Herman's favor on her claim under the Equal Pay Act.  *See Buntin*, 134 F.3d at 799-800 and n.7; *see also Kovacevich*, 224 F.3d at 826-27.

Accordingly, Defendants are not entitled to summary judgment on Herman's claim under Equal Pay Act.

## B.    Equal Protection, Sex Discrimination, and 42 U.S.C. §1983

### 1.
### Applicable Standards

42 U.S.C. §1983 permits Herman to assert a claim that Defendants violated her constitutional rights.  *Smith v. City of Salem*, 378 F.3d 566, 576 (6th Cir. 2004).  As a public employee, Herman holds a constitutional right under the Equal Protection Clause of the Fourteenth Amendment to be free from discrimination on the basis of sex.  *Smith*, 378 F.3d at 576-77 (citing *Davis v. Passman,* 442 U.S. 228, 234-35 (1979)).  To establish that Defendants

violated this right, Herman must show that she suffered intentional discrimination on the basis of her gender.  *Smith*, 378 F.3d at 577 (citing *Village of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 264-65 (1977)).

Although Herman's Complaint never mentions disparate treatment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq*., "to prove a violation of the Equal Protection Clause under §1983, she must prove the same elements as are required to establish a disparate treatment claim under Title VII, i.e., under the *McDonnell Douglas/Burdine*[3] framework." *Lautermilch v. Findlay City Schools*, 314 F.3d 271, 275 (6th Cir. 2003)(citations omitted); *see Singfield v. Akron Metropolitan Housing Authority*, 389 F.3d 555, 566-67 (6th Cir. 2004).  This framework requires Herman to first produce evidence of a prima facie case of discrimination. *Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003).  In response, Defendants must articulate a legitimate non-discriminatory reason for their relevant employment decision. *Carter*, 349 F.3d at 273.  If Defendants meet this burden of production, Herman must demonstrate the existence of a genuine issue of fact concerning whether Defendants' articulated reasons are a pretext, or a cover-up, of intentional discrimination.   *Carter*, 349 F.3d at 273.

To establish her sex discrimination claim under the Equal Protection Clause, Herman at all times retains the ultimate burden of persuasion.  *See Dews v. A.B. Dick Co*., 231 F.3d 1016, 1021 (6th Cir. 2000).

Defendants acknowledge that Herman can establish a prima facie case of sex discrimination with regard to her failure-to-promote claim.  (Doc. #19 at 7-8).  Defendants

---

[3]  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

18

consequently articulate the following legitimate, non-discriminatory reasons for their decision

not to promote Herman to the position of Assistant Director/Director of Administration:

Pilkenton was more qualified than Herman for this position.  *Id*. at 8.  Because Defendants have

met their burden of production, Herman's Equal Protection claim turns on whether she has

produced evidence sufficient to create a genuine issue of material fact regarding pretext and

intentional discrimination.

**2.**
**Pretext and Intentional Discrimination**

Defendants contend that Herman cannot establish pretext or intentional discrimination,

because she cannot produce evidence that Defendants' decision to promote Pilkenton was based

upon any reason other than his superior budgeting and management experience, and because

there is no evidence that Defendants based their decision on sex.  Defendants emphasize that just

because Herman was qualified did not prohibit them from promoting Pinkleton, a more qualified

candidate.

Herman may establish pretext three alternative ways:  (1) Defendants' articulated reason

had no basis in fact, (2) the reason did not actually motivate Defendants' decision, or (3) the

reason was insufficient to motivate Defendants' decision.  *Manzer v. Diamond Shamrock*

*Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994); *see Carter*, 349 F.3d at 274.  The Sixth

Circuit Court of Appeals has further instructed that caution should be exercised in granting

summary judgment once a plaintiff has established a prima facie case.  *See Singfield*, 389 F.3d

at 564-65.  This is so because the ultimate question of the true reasons for an employer's

decisions often present an "elusive factual question ... incapable of resolution on summary

judgment."  *Singfield*, 389 F.3d at 564-65 (quoting in part *Burdine,* 450 U.S. at 255 n.8).

19

The record contains sufficient evidence to create genuine issues of material fact concerning whether Commissioner Bines sought to promote Pilkenton rather than Herman to the position of Assistant Director/Director of Administrative Services not because of Pilkenton's superior qualifications but because of sex.  The written job description explained, "This position requires extensive knowledge of management, financial operations, public and human relations, governmental structure & process and general knowledge of human resources and information systems."  (Doc. #13, Bines depos., Exh. 10).  Construing the record in Herman's favor, her nine years of work experience with the Health District provided her with more extensive knowledge of government structure and process than Pilkenton.  This was one of the key qualifications for the position at issue.  *Id.*  Although Pilkenton had much more budgeting experience in the private sector, he had never worked in the public sector or in the field of public health prior to his employment with the Health District.  Herman, in contrast, had nine years of experience with the Health District.  Construing this difference in Herman's favor, her work experience and knowledge of public health administration was much more extensive than Pilkenton's private sector work experience and was more relevant to the particular Division-level position at issue.

Commissioner Bines, moreover, altered the job description of the Director, Division of Administration position when he posted the opening both Pilkenton and Herman sought.  Previously, in February 1999, the job description stated, "Five to seven years of responsible experience at the management level.  *Public health department experience is preferred....*"  (Doc. #13, Bines' depos., Exh. 9)(emphasis added).  In contrast, when Bines posted the opening for the position sought by Pilkenton and Herman, he deleted this preference for public health department experience.  *Id.* at Exh. 10.  A jury could reasonably infer, in Herman's favor, that

20

Commissioner Bines did this in order to eliminate an attribute of work experience that favored Herman over Pilkenton. The reasonable nature of this inference is enhanced by the undisputed facts concerning the selection process Bines employed. It is undisputed that Bines expressed his preference for Pilkenton to the Division Directors before they interviewed the six finalists. (Doc. #13, Bines depos. at 73). By biasing the process in favor of Pilkenton in this manner, Bines created a selection process geared to justify promoting Pilkenton rather than one geared towards obtaining the unbiased assessments of the Division Directors. The process itself then reflected the bias not just by the resulting rankings, which favored Pilkenton, but also by the fact that not all the Division Directors interviewed the final six candidates. Bines acknowledged during his deposition that the Division Directors "were at a disadvantage to know some of the candidates, but I still required them to participate in the ranking and selection process." *Id*. at 72-73. This tends to show, when viewed in Herman's favor, that Bines was less concerned with the quality of the Division Directors' assessments and was more concerned with obtaining recommendations favoring Pilkenton.

Bines also allegedly informed Herman that he selected Pilkenton because he had a good relationship with Tim Nolan, who was a County Budget Manager. (Doc. #12, Herman depos. at 95). Herman explains that she too had a good relationship with Nolan, had attended graduate school with him, and had known him for twelve years. *Id*. Accepting this testimony as true reveals that at the time of his decision, Bines provided an additional, and perhaps different, reason for the decision than the reason presently articulated by Defendants. When viewed in Herman's favor, this tends to show that the Defendants' present reason was a pretext for intentional discrimination. *See Thurman v. Yellow Freight Systems, Inc*., 90 F.3d 1160, 1167 (6th

21

Cir. 1996)("An employer's changing rationale for making an adverse employment decision can be evidence of pretext.").

This is not to say that the above is the only way to reasonably construe the present record. It is, moreover, significant that neither Title VII nor the Equal Protection Clause diminishes "lawful traditional management prerogatives in choosing among qualified candidates." *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 436-37 (6th Cir. 2002)(quoting *Wrenn v. Gould,* 808 F.2d 493, 502 (6th Cir.1987)).  Yet, Herman's prima facie case together with the additional circumstantial evidence discussed above create genuine issues concerning whether Defendants' articulated, non-discriminatory reason for promoting Pilkenton over Herman to the position of Assistant Director/Director of Administration was a pretext for intentional sex discrimination.

Herman's Complaint also bases her sex discrimination claim on the greater pay Pilkenton received as Supervisor, Bureau of Management and Budget.  (Doc. #1 at 3-4).  Defendants are not entitled to summary judgment because this aspect of her sex discrimination claim is based on the same conduct that is at issue with regard to her claim under the Equal Pay Act.  "[W]here the plaintiff defeats the defendant's motion for judgment as a matter of law with respect to her [Equal Pay Act] claim by raising a genuine issue as to the defendant's reason for the differential wage, she also defeats their motion for judgment as a matter of law brought against her parallel Title VII claim."  *Buntin*, 134 F.3d at 801.

Accordingly, Defendants are not entitled to summary judgment on Herman's claim that Defendants discriminated against her on the basis of sex in violation of the Equal Protection Clause.

**C.** **Remaining Claims**

Herman's sex discrimination claims under Ohio statutory law is subject to the same analysis discussed above concerning her sex discrimination claim under the Equal Protection Clause. *See Laderach v. U-Haul of Northwestern Ohio*, 207 F.3d 825, 828 (6th Cir. 2000)(and cases cited therein). Defendants are therefore not entitled to summary judgment on Herman's sex discrimination claim under Ohio Rev. Code §§4112.02(A) and 4112.99.

Herman's remaining claim is based on the theory that Defendants' discriminated against her in violation of Ohio Public Policy. One essential question not addressed by the parties is whether Ohio law provides a cause of action based on a violation of public policy in a context other than wrongful termination of employment. Research reveals at least one case by the Ohio Court of Appeals holding, "the public policy tort has not been extended to claims for failure to promote or retaliation." *Strausbaugh v. Ohio Dept. of Transportation*, 150 Ohio App.3d 438, 449 (2002); *see Bools v. General Electric Company*, 70 F.Supp.2d 829, 831-32 (S.D. Ohio 1999)(Spiegel, D.J.). Because the parties have yet to address this potentially dispositive issue, summary judgment is not warranted on Herman's public policy claim.

**IT IS THEREFORE ORDERED THAT:**

1.      Defendants' Motion for Summary Judgment (Doc. #10) is OVERRULED;

2.      The dates, including the trial date of May 16, 2005, set forth in the Court's prior Scheduling Order (Doc. #6) are CONFIRMED.

23

May 4, 2005

                                                                                       __s/ Sharon L. Ovington_____

                                                                                         Sharon L. Ovington
                                                                      United States Magistrate Judge